UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SEAN K. ELLIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 01-12147-PBS |
| | ) | |
| JOHN MARSHALL, | ) | |
| | ) | |
| Respondent. | ) | |

AMENDED[1] REPORT AND RECOMMENDATION ON
PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

June 13, 2012

SOROKIN, C.M.J.

Pending is the Petition for Writ of Habeas Corpus (Docket # 1) of the Petitioner, Sean K.

---

[1] The Report and Recommendation on the Petition for Writ of Habeas Corpus issued on May 22, 2012, included a footnote in which the Court noted that neither party had provided the Court with the full set of trial transcripts. Following the issuance of the Report and Recommendation, the Attorney General's Office informed the Court that it had included these transcripts in its supplemental answer. The Attorney General's Office also provided a courtesy copy of the transcripts of the second trial to the Court. The Court found that one relevant day of the second trial, namely March 31, 1995, was missing from the courtesy copy and was not available in the clerk's office file. The Attorney General's Office stated that it could not find this particular day's transcript in its file, but had contacted the District Attorney's Office to request the transcript. Notwithstanding the absence of this transcript, the Court proceeds to issue this Report and Recommendation because nothing before the Court disputes the Supreme Judicial Court's summary of proceedings, rather Petitioner disagrees with the legal conclusions drawn from the record. Regarding the other transcripts, nothing in the recently (re)submitted transcripts alters the analysis set forth in the original Report and Recommendation. Accordingly, I therefore reissue the Report and Recommendation, which is the same in all respects except for this revised footnote and the second paragraph of the Report and Recommendation.

1

Ellis. I RECOMMEND that the Petition be DENIED, for the reasons set forth below.

I do note one issue. The Court stayed this case on October 31, 2003, in order to permit Petitioner to return to state court to exhaust another issue. Years later, on June 15, 2010, the Respondent moved to vacate the stay. Docket #s 66-67. Although Attorney Scapicchio provided the Court with information on Ellis's behalf regarding the motion to vacate the stay, she did not file an appearance in this case at that time. Docket # 72. Ultimately, the undersigned allowed the motion to vacate the stay on December 29, 2010. Docket # 74. On June 7, 2012, Attorney Scapicchio filed a notice of appearance in this case on Ellis's behalf. Docket # 83. To date, she has neither requested leave to supplement the briefing on the exhausted issues nor requested leave to amend the petition to advance any claim(s) exhausted since the Court entered the stay in this case.

I.  FACTUAL AND PROCEDURAL BACKGROUND

The following factual information, which is recited in Commonwealth v. Ellis, 739 N.E.2d 1107 (Mass. 2000), is presumed to be correct.[2] See 28 U.S.C. § 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002).

> The murder victim, Detective John Mulligan of the Boston police department, was shot five times in the head in the early morning hours of September 26, 1993, while working a paid security detail in the parking lot of a Walgreens store in the Roslindale section of Boston. At approximately 2:45 or 3 A.M. [Ellis], Terry Patterson, and a woman arrived at the Walgreens. They traveled in Patterson's brown automobile. The vehicle had tinted windows, "custom wheels," and a "racing bra" on the front grill.
>
> At about 3:05 A.M., Rosa Sanchez and her husband arrived at the Walgreens. She saw the victim asleep in the front seat of his truck. Although the truck was not an official police vehicle, the victim's uniform and orange raincoat indicated that he was a police officer. As she walked past the victim's truck, she noticed a man, later

---

[2] Further facts relevant to Ellis's claims will be recited within the discussion of each claim.

2

identified by her as [Ellis] crouching beside it. After making eye contact with the man, she entered the Walgreens and was in there for approximately twenty minutes. As she left the store, Rosa Sanchez again saw [Ellis], this time with Patterson near the public telephones outside of Walgreens. At roughly the same time, Evoney Chung also saw two individuals fitting the description of [Ellis] and Patterson near the telephones. At about 3:35 A.M. another witness observed the brown automobile speeding away from a sidewalk near Walgreens.

At approximately 3:45 A.M., a Walgreens employee approached the victim's car and saw that the victim's face was covered with blood. Another employee placed a 911 call that was recorded at 3:49 A.M. Paramedics soon arrived and determined that Mulligan had been shot several times in the face and had no vital signs. The victim's sweater had been pulled up, his holster was empty, and his department issued handgun was missing. The victim was taken to a hospital where he was pronounced dead. An autopsy later determined that the five shots had been fired at close range and that any one of them could have been fatal.

On September 30, 1993, the police questioned [Ellis]. He told detectives that he had gone to the Walgreens at about 2:45 or 3 A.M. on September 26. He acknowledged entering the Walgreens and purchasing diapers, and that he had used a public telephone, but denied any involvement in the murder. Meanwhile, that same day, [Ellis's] girl friend accompanied [Ellis] to an apartment where he retrieved a bag. On returning to the girl friend's apartment, [Ellis] removed two guns from the bag. One of the guns was a black nine millimeter Glack handgun; the other was a silver .25 caliber Raven handgun. The next day (October 1, 1993), a friend of [Ellis] retrieved the guns from the girl friend's apartment and hid them in a field. On October 7, 1993, the police found the guns. Subsequent investigation revealed that the nine millimeter Glock was the victim's service weapon and the .25 caliber Raven handgun was the murder weapon.

The police also identified Patterson's fingerprints on the driver's side door of the victim's truck. No fingerprints of [Ellis] were found. The police also located Patterson's automobile; it had no registration plates and there was evidence that part of the window tinting had been removed.

On October 5, 1993, Rosa Sanchez reviewed a photographic array of possible suspects at the Boston homicide unit. The facts surrounding the photographic array are explored in more detail below, but we note that Sanchez initially identified someone other than [Ellis]. After a short break, Sanchez was again shown the photographic array and identified [Ellis's] photograph as the man she had seen crouching beside the victim's car. On October 18, 1993, Sanchez chose [Ellis] from a police lineup and again identified him as the man she had seen crouching near the victim's car.

3

Ellis, 739 N.E.2d at 1110-11.

On October 27, 1993, a Suffolk County grand jury returned indictments charging Ellis with murder, armed robbery, and possession of firearms without a license. Id. at 1111. Ellis filed a pretrial motion to suppress the photographic identification evidence which was denied after a three-day evidentiary hearing. Id. On September 14, 1995, after two mistrials, a third jury convicted Ellis. Id. On September 29, 1998, Ellis moved for a new trial and reconsideration of the denial of his motion to suppress the identification. Id. On March 4, 1999, Ellis's motion was denied. Id.

The Supreme Judicial Court ("SJC") affirmed Ellis's conviction on December 6, 2000. Id. at 1122. On December 6, 2001, he filed the instant Petition for Writ of Habeas Corpus. Docket # 1. Briefing was completed on September 30, 2002. Docket # 23. On September 15, 2003, Ellis moved for a stay of the habeas proceeding in order to permit him to exhaust a claim not raised in his Petition. Docket # 34. On October 30, 2003, the Court allowed Ellis's motion for a stay, subject to the following conditions: that Ellis (who was by then proceeding pro se)[3] file status reports every ninety days apprising the Court of the progress of the new claim in the state trial and appellate courts; and that he move to amend his Petition within twenty days after the conclusion of the state court proceedings. Docket # 39. Beginning on November 17, 2003, and continuing until May 28, 2010, Ellis filed twenty-three such status reports and/or letters with the Court. Dockets # 41, 44-49, 51-65.

On December 1, 2004, Ellis informed the Court in a status report that, "[a] quasi-judicial

---

[3] The new claim which Ellis sought to exhaust was an ineffective assistance of counsel claim, which prompted his counsel (who had also represented him in his state criminal trial) to withdraw, citing a conflict of interest. Docket # 39 at 2. The Court declined to appoint successor counsel. Id.

4

agency has assigned an [a]ttorney to review the case involving this Petitioner, this took place [o]n October 15, 2004. I am awaiting the conclusion of such review." Docket # 45. Each subsequent status report over the subsequent five and one-half years repeated this same information without substantial variation. Dockets # 46–49, 51-65. On June 15, 2010, the Respondent moved to vacate the stay on the grounds that although nearly seven years had passed, Ellis had not exhausted his additional claim. Docket # 66. Documents attached to the Respondent's motion established that Ellis had not to date filed a motion for a new trial. Docket # 67-1.

On July 14, 2010, attorney Rosemary Scapicchio (who had not entered an appearance in the habeas matter) indicated by letter that she represented Ellis in connection with his motion for a new trial and had only recently received responses to Freedom of Information Act ("FOIA") requests made on Ellis's behalf, and that she anticipated filing Ellis's motion with the state court by October, 2010. Docket # 72. On August 5, 2010, the Court directed Ellis (or Scapicchio, if she filed an appearance) to apprise the Court within fourteen days of the particulars of what was required prior to filing any motion for a new trial and the status of such activities. Docket # 74. No such filing was made and Scapicchio did not then file a notice of appearance.

Ellis's status report of October 21, 2010, indicated that his attorney was still awaiting documents in response to her FOIA requests (and suggesting that the FOIA requests had not been made seven years' prior). Docket # 73. On December 29, 2010, the undersigned magistrate judge allowed the Respondent's motion to vacate the stay, and indicated that I intended to act to resolve the pending habeas petition by considering the previously-completed briefing and issuing a Report and Recommendation to the District Judge. Docket # 74. There is no indication in the record that Ellis has filed a motion for a new trial in the state court as of this date, although Attorney Scapicchio

5

filed a notice of appearance in this case on June 7, 2012.

II.  DISCUSSION

Ellis advances two claims in support of his Petition.[4]  First, he contends that his third trial was conducted in violation of his Fifth Amendment right not to be put twice in jeopardy, because the trial judge declared a second mistrial without manifest necessity.  Second, he contends that he was denied his Sixth Amendment right to confront witnesses against him when the trial judge improperly limited the scope of his cross examination of two witnesses.

　A.  Habeas Corpus Standard of Review

Ellis cannot obtain federal habeas relief under 28 U.S.C. § 2254(d)(1) unless he can show that the Massachusetts courts' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  A legal principle is "clearly established" within the meaning of this provision only when it is embodied in a holding of the United States Supreme Court.  Thaler v. Haynes, 130 S. Ct. 1171, 1173 (2010).

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's

---

[4] Ellis's Petition raised a third claim, that he was denied the right to present a defense by the state court's refusal to grant him a new trial based on newly-discovered evidence of the systematic corrupt practices of key members of the Boston police investigatory team.  Ellis abandons this claim in his memorandum in support of his Petition.  Docket # 20 at 3.

6

case." Id. at 413. Moreover, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

B. Ellis's Double Jeopardy Claim

In the course of analyzing Ellis's double jeopardy claim, the SJC recited the following additional factual information relevant to that claim, which is presumed to be correct. See 28 U.S.C. § 2254(e)(1); Gunter, 291 F.3d at 76.

> Ellis's first trial began on January 4, 1995. On January 12, prior to sending the jurors to deliberate, the judge instructed the jury on murder and on the theory of joint venture. On January 13 and again on January 17, the jury requested additional instructions on joint venture. On January 19, the jury asked the judge the following question: "[I]n considering the rule of joint venture, does conscious concealment of a known murder weapon constitute aiding and abetting?" The judge rejected [Ellis's] proposed answer[5] and responded as follows: "That question is phrased in such a way that it is really out of the context of the entire evidentiary picture in this case, and I can't answer a question like that that is taken out of context in that fashion. I am not disparaging you in any way, but it is couched in such terms that I cannot directly answer that question." On January 21, 1995, the jury reported themselves deadlocked on the charges of murder and armed robbery, and the judge declared a mistrial.
>
> On March 21, 1995, the second trial began before the same judge. On March

---

[5] Ellis asked the judge to give the following response:

It is not enough to find the defendant Sean Ellis guilty of murder or armed robbery as a joint venturer to conclude that he assisted the principal or principals in some way after those crimes had been committed, unless you find, beyond a reasonable doubt, that he was present at the time and place the offenses were committed, and that he intentionally assisted or stood ready to assist the perpetrator in committing those crimes while sharing with the other person or persons the mental state or intent required to convict the principal of those crimes.

Ellis, 739 N.E.2d at 1112 n.1.

7

30, 1995, the judge instructed the jury on the elements of murder and on the theory of joint venture. [Ellis] objected to the judge's refusal to offer a proposed jury instruction.[6] On March 31, the jury requested additional instructions on joint venture and on murder in the first and second degrees. Later that day, the jury sent the judge a note stating, "Pursuant to the following concerns could you please reiterate *joint venture* only" (emphasis in the original). In an accompanying note, the jury identified their concerns: "Joint venture. Recognition of crime after the fact. Defendant fleeing with the perpetrator of the crime from scene of crime without prior knowledge of crime or participation of crime constitutes joint venture. Acceptance of weapons immediately after crime. Holding and transfer of known murder weapon and known [blank]. Aiding and abetting after the fact with knowledge of the crime after crime was committed." The judge rejected [Ellis's] proposed response[7] and, over [Ellis's] objection, repeated his original joint venture charge in its entirety. On April 1, 1995, the jury reported they were deadlocked. The judge rejected [Ellis's] request that the jury be either dismissed or read the joint venture instruction he had proposed. Instead, the judge gave the jury a "Tuey-Rodriquez" charge. Commonwealth v. Rodriquez, 300 N.E.2d 192 (1973). Within two hours, the jury returned and again reported they were deadlocked. Over [Ellis's] objection, the judge ordered a mistrial on the ground of manifest necessity.

    [Ellis] then moved to dismiss the indictments on the ground that a retrial would constitute double jeopardy under the United States Constitution. The motion was denied, as was the petition to a single justice of this court pursuant to G.L. c. 211, § 3.

Ellis, 739 N.E.2d at 1111-12.

The SJC found that the trial judge's handling of the jury's questions at the second trial did not place Ellis in double jeopardy, for two reasons. First, it found that the trial judge's decision to repeat his original joint venture instruction, rather than to give the instruction requested by Ellis, was

---

[6] Ellis's proposed jury instruction emphasized that the Commonwealth "must prove more than mere association with the perpetrator of the crime either before the commission of the crime or after the commission of the crime" and that "[the jury] may consider the defendant's mental condition on the night in question including any intoxication by voluntary consumption of alcohol, in determining whether or not the Commonwealth has proved beyond a reasonable doubt that the defendant intentionally assisted others in committing the crime and that he shared the intent required for committing the crime." Ellis, 739 N.E.2d at 1112 n.2.

[7] Ellis asked the judge to give the response he had requested at the first trial. Ellis, 739 N.E.2d at 1112 n.3; see note 4, supra.

8

not error, but was a reasonable response to the jury's request to "reiterate" joint venture and a means of avoiding the risk of confusing the jury or giving an erroneous instruction. Id. at 1113 (citing Commonwealth v. Johnson, 711 N.E.2d 578 (Mass. 1999) (necessity, extent, and character of supplemental instructions in response to jury's request fall within trial judge's discretion)). Second, it found that even if the trial judge had erred, Ellis had not made the requisite showing of bad faith. Id. (citing Commonwealth v. Andrews, 530 N.E.2d 1222, 1226 (Mass. 1988); United States v. Dinitz, 424 U.S. 600, 611 (1976)).

### 1. Merits of Double Jeopardy Claim

The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant against "repeated prosecutions for the same offense" and affords the defendant a "valued right to have his trial completed by a particular tribunal." Dinitz, 424 U.S. at 606 (quotation omitted); see also Oregon v. Kennedy, 456 U.S. 667, 671 (1982). If a judge declares a mistrial over the objection of the defendant, a retrial will be barred unless the mistrial was justified by "manifest necessity." Kennedy, 456 U.S. at 672. The doctrine of manifest necessity, "stands as a command to trial judges not to foreclose the defendant's option [to try the case with the existing jury] until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." Dinitz, 424 U.S. at 607.

The "manifest necessity" standard "cannot be interpreted literally;" a mistrial is appropriate when there is a 'high degree" of necessity. Arizona v. Washington, 434 U.S. 497, 506 (1978). The trial judge exercises "broad discretion" in deciding whether or not "manifest necessity" justifies a discharge of the jury. Id. at 509. In describing "the spectrum of trial problems which may warrant a mistrial and which vary in their amendability to appellate scrutiny," the Supreme Court has

9

described "the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict" as being at that extreme end of the spectrum at which a mistrial is most proper, and at which the trial judge's decision is accorded the greatest degree of deference. Id. at 509-10.

Ellis first contests the reasonableness of the SJC's determination that the trial judge's decision to repeat his original joint venture instruction, rather than tailoring a more direct answer to the question submitted by the jury, was a reasonable response to the jury's request to "reiterate" joint venture. Ellis argues that the trial judge's actions were manifestly unreasonable in light of the jury's use of the word "reiterate" in conjunction with the modifying phrase "pursuant to the following concerns," namely the issue of joint venture culpability. Docket # 67-4 at 13 (citing Bollenbach v. United States, 326 U.S. 607, 612-13 (1946) (citations omitted) (it is the trial judge's duty "when a jury makes explicit its difficulties . . . [to] clear them away with concrete accuracy.")). Ellis asserts that the trial judge's failure to consider the less drastic remedy of giving a tailored instruction, such as that submitted by Ellis, demonstrates that a mistrial was not manifestly necessary. Id. He argues that the SJC rightly concluded that the jury had specific concerns which were not addressed, but then concluded contrary to Bollenbach's admonition to address the jury's specific concerns that doing so ran the risk of giving an erroneous instruction or confusing the jury. Id.

The situation in Bollenbach is distinguishable from that presented here in that the trial judge in Bollenbach gave an instruction that was legally incorrect; "he was not even 'cursorily' accurate. He was simply wrong." Bollenbach, 326 U.S. at 612-13. There is no dispute that the instruction repeated by the trial judge in this case was an accurate one. The question is whether it went far enough. To be sure, the Bollenbach court emphasized the judge's duty to clear away the jury's

10

difficulties with concrete accuracy. Id. However, the trial judge emphasized in his repeated instruction that Ellis could not be convicted of murder as a joint venturer unless he was present at the scene, shared Patterson's intent to rob or murder, and played a concerted role in the crime. (Trial Transcript of Mar. 30, 1995, at vol. 7, 44-48). Although the trial judge did not frame his response in the exact terms Ellis requested, he did nevertheless address the jury's concerns accurately. "The district court is not bound to submit to a party's wish list of charges to be ingeminated." United States v. Ladd, 885 F.2d 954, 961 (1st Cir. 1989). Decisions of that sort are committed to the court's informed judgment and discretion and the court should strike a balance between acceptable helpfulness on the court's part on the one hand, and unacceptable intrusion into the jury's province on the other. Id. "In the ordinary case, prudence dictates that the trial court should confine its response to the approximate boundaries of the jury's inquiry." Id. The trial judge in this case did so. Accordingly, the SJC's ruling that the trial judge reasonably responded to the jury's question was neither contrary to, nor an unreasonable application of clearly established Federal law, as determined by the Supreme Court.

Moreover, on habeas review of a state court conviction, constitutional error is harmless unless it had a "substantial and injurious effect" or influence in determining the jury's verdict. Fry v. Pliler, 551 U.S. 112, 121 (2007) (citing Brecht v. Abrahamson, 507 U.S. 619 (1993)). Petitioner fails to meet his burden under this standard in light of the SJC's reasonable determination that Ellis was engaging in pure speculation when he contended that the response he requested would have made any difference in resolving the jury's deadlock. Ellis, 739 N.E.2d at 1113.

2. Bad Faith

Ellis argues that the SJC's reference to a lack of evidence of bad faith on the part of the trial judge in declaring a mistrial was misplaced. He contends that the holding of the Dinitz case, (cited for the proposition that "[a]bsent evidence that the judge acted in bad faith, alleged judicial errors giving rise to a mistrial do not support a claim of double jeopardy," Ellis, 739 N.E.2d at 1113) applies only in those circumstances where a defendant has requested a mistrial and not where the Court has declared a mistrial over the defendant's objection. See Dinitz, 424 U.S. at 611. The Court need not resolve this issue as it was an alternative ground for the SJC's decision. Petitioner has failed to establish error in the SJC's finding of "manifest necessity" for the declaration of the mistrial. That finding plainly suffices to authorize the retrial in these circumstances. Kennedy, 456 U.S. at 672; Dinitz, 424 U.S. at 606-07. In any event, the SJC's decision that the jury instructions were not infected with bad faith is neither clearly erroneous or unreasonable application of clearly established Federal law, as determined by the Supreme Court.

C. The Sixth Amendment Confrontation Claims

1. Witness Chung

In the course of analyzing Ellis's Sixth Amendment confrontation claim, concerning witness Evoney Chung, the SJC recited the following additional factual information relevant to that claim, which is presumed to be correct. See 28 U.S.C. § 2254(e)(1); Gunter, 291 F.3d at 76.

> In March, 1995, between [Ellis's] first and second trials, Evoney Chung, a witness for the Commonwealth, was charged in the Dorchester Division of the District Court with possession of a Class D substance with intent to distribute. Prior to the second trial, the Commonwealth filed a motion in limine to prevent [Ellis] from examining her at trial about the charge. The trial judge granted the motion and excluded testimony on that issue. In May, 1995, between the second and third trials, the Commonwealth dropped the charge against Chung. At the third trial, over [Ellis's] objection, the judge again refused to allow [Ellis] to examine Chung about

12

the charge. [Ellis] claims this impermissibly restricted his confrontational rights because he was not allowed to question Chung about her possible bias stemming from the dropped charge.

Chung testified at all three trials that, on September 26, she was at the Walgreens with her boy friend, Joseph Saunders; that she passed two black men as she left the store, and that she saw the same two men near the telephones as she and Saunders drove away. At all three trials she testified that she had not seen their faces. In these respects her testimony at the third trial was no different from her testimony at the two earlier trials. At issue is Chung's testimony regarding the time she arrived at the Walgreens which [Ellis] claims she changed as an act of repayment to the Commonwealth for dropping the charge against her.

In October, 1993, Chung made an initial statement to the police. At that time, she estimated that the movie she had seen ended at "about 3:10," and that she arrived at Walgreens between "about [3]:35 and 3:40 [A.M.]." On cross-examination at the first trial, when asked about the timing of her arrival at Walgreens, Chung answered, "I'm actually guessing at the time based on what time I believe the movie ended. It could have been between 3:20, 3:30 or even 3:35. I was not paying close attention to the time." When asked about her earlier statement to the police she stated, "I wasn't sure back then of the times, either; because . . . I didn't check my watch. When I got to Walgreens, I didn't check my watch. I just got out of the movie and went to Walgreens. So I couldn't give you an approximate time." On direct examination at the second trial, she placed her arrival time at "[r]oughly about 3:10. Somewhere around there." On cross-examination she narrowed her arrival time to "3:17, 3:20." At the third trial, after the charge had been dropped, Chung testified on direct examination that she arrived at Walgreens "after 3:00," and was inside for "ten to twelve minutes." She estimated that she left the store "before 3:30." [Ellis] then sought to cross-examine her about the dropped drug charge. At a sidebar conference, defense counsel told the judge that, in his view, Chung had changed her testimony several times, each time in favor of the Commonwealth, and argued that he should be able to question the witness about the drug charge and its relation to the changes in her testimony. The judge refused to permit that line of questions, reasoning that the change in testimony was not "significant enough" to warrant further inquiry. Thereafter, [Ellis] marked certain documents (i.e., the docket and the police report filed in conjunction with Chung's charges) for identification and questioned her about the prior time-related statements and testimony.

Chung's shift in testimony from "between 3:20, 3:30 or even 3:35" (first trial), "[r]oughly about 3:10" (second trial), and "after 3:00" arguably bolstered the Commonwealth's case by lending support to the testimony of Rosa Sanchez. Sanchez testified that she saw [Ellis] as she entered Walgreens at approximately 3:05 A.M. and again, when she left the store a little after 3:20 A.M. Accordingly, Chung's testimony at the first trial (an arrival time of 3:20 A.M.) meant that she

13

> might have seen [Ellis] in the parking lot after Sanchez left, while Chung's testimony at the second trial (arrival at "[r]oughly about 3:10") and her testimony at the third trial (arrival "after 3:00") arguably suggested that she had seen [Ellis] at the same time Sanchez claimed to have seen him.

Ellis, 739 N.E.2d at 1113-14.

Regarding Ellis' claim of bias, the SJC stated that "[i]t may have been error for the trial judge to preclude inquiry into the dismissed charge. However, even if the exclusion was improper, it did not amount to reversible error" because "any error on the part of the judge was harmless beyond a reasonable doubt." Id. at 1115 (citing Commonwealth v. Babbitt, 723 N.E.2d 17, 24-25 (Mass. 2000)). The SJC's decision is neither contrary to nor an unreasonable application of clearly established Federal law, as determined by the Supreme Court. The Supreme Court has ruled that a violation of a defendant's constitutional right to confront a witness against him in a criminal trial which arises from a judge precluding any examination regarding bias fails to warrant reversal of the judgment when the error is harmless beyond a reasonable doubt. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

The SJC premised its harmless error conclusion upon a close analysis of the factual record. It rejected the contention that Chung's testimony was critical, rather it noted Ellis admitted to using the public phone outside the Walgreens at 2:45 or 3:00 a.m. Ellis, 739 N.E.2d at 1115. Indeed, Chung conceded she avoided eye contact with the men she saw and that she was unable to make an identification. Id. The SJC also noted that Chung's time estimates at each of the three trials were "imprecise, and most were qualified by words such as 'guessing,' 'roughly,' and 'somewhere around there.'" Id. Finally, the SJC found that "through vigorous cross-examination, [Ellis] exposed each of the variations in Chung's statements throughout the course of the police investigation and subsequent trials. In so doing, [Ellis] elicited information from which the jury could conclude that

14

Chung's recollection of time was unreliable." Id.

Although the SJC did not cite Van Arsdall, its decision comports with this Supreme Court precedent. See Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam) (noting that a state court need not cite or even be aware of Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them."). The SJC recognized the potential for bias in Chung's testimony, but found that the trial court limited the cross examination concerning the bias on a reasonable basis in accord with Van Arsdall. Ellis, 739 N.E.2d at 1115. On this record, its ruling that any error was harmless beyond a reasonable doubt is neither contrary to nor an unreasonable application of clearly established Federal law, as determined by the Supreme Court.[8] Accordingly, Ellis cannot succeed on this claim.

2. Witness Sanchez

In the course of analyzing Ellis's Sixth Amendment confrontation claim concerning witness Rosa Sanchez, the SJC recited the following additional factual information relevant to that claim, which is presumed to be correct. See 28 U.S.C. § 2254(e)(1); Gunter, 291 F.3d at 76.

> Rosa Sanchez was a key witness for the Commonwealth. At the third trial she testified that she was at the Walgreens at 3 A.M. and, on entering the store, saw a "guy crouching by [the victim's] car." During the brief encounter, she "looked up at him" and he "looked up at [her]." On leaving the Walgreens, she saw the same person standing with another man at the telephones. As she and her husband drove from the parking lot, she again noticed both men.
>
> On October 5, 1993, Detective Acerra (who was then living with Sanchez's aunt) and Detective Robinson drove Sanchez and her husband to the police department. Sanchez said she was "scared" at the time. Detective Ross testified that Sanchez appeared "frightened, nervous, scared, upset." At the police station, Sanchez was separated from her husband and escorted to a room where Detective

---

[8] Insofar as this presents a mixed question of law or fact, Ellis has not established that any factual determinations by the SJC were clearly erroneous.

15

Ross showed her two photographic arrays of eight photographs each; one containing a photograph of [Ellis] ([Ellis] array) and one containing a photograph of Patterson (Patterson's array). Each array consisted of black males in the vicinity of [Ellis's] age, with similar skin tone and hairstyle. Detective Ross first showed Sanchez the [Ellis] array. After viewing the array for about five minutes, Sanchez became very upset, started shaking, and then pointed to a photograph of a man, Alfred Glover, and said, "That's the man that's been following me, the police are looking for him, I've never seen his picture before." On seeing this photograph of her alleged stalker, Sanchez began to cry. Detective Ross, "totally confused" by her selection and the related stalker comment, covered up Glover's photograph and asked her to make another selection. At this point, he testified, Sanchez was "very anxious" and "appeared to be very frightened." Sanchez again reviewed the photographic array for a few minutes, pointed to a photograph of an individual other than [Ellis] and said, "I think that may be the person."[9] After the selection, Sanchez put her head down, started crying, and "start[ed] to lose her composure completely." No markings were made on the photograph to indicate her selection.[10] As discussed below, the parties have attributed her selection of someone other than [Ellis] to different causes.

After the misidentification, Sanchez was reunited with her husband and Detectives Acerra and Robinson. At this point, according to her testimony, Sanchez told her husband that she deliberately chose "the wrong guy," i.e., someone other than [Ellis]. Her husband informed Detective Robinson, who, after about five or ten minutes brought Sanchez back to the photo identification room. She was no longer crying and according to Detective Ross, "seemed relatively normal" and "pretty much in control." The police tape recorded Sanchez's second identification. Detective Ross first presented the Patterson array, but Sanchez pushed it away. When presented with the [Ellis] array, she immediately picked out [Ellis] and said, "That's him right there, that's the man that I saw crouching down by the car." Sanchez signed her name to the back of the photograph. Approximately two weeks later, Sanchez identified [Ellis] in a police lineup.[11]

In January, 1995, [Ellis] submitted an offer of proof intending to show that

---

[9] The court noted that "[Sanchez's] husband had pointed to the same photograph during his photographic identification session on October 3, 1993." Ellis, 739 N.E.2d at 1116 n.6.

[10] The court noted that "[w]hen asked why Sanchez's identification of the stalker was not signed, Detective Ross stated, 'It was not an identification relative to this investigation.' Similarly, her other identification was not signed because Sanchez's qualification, 'I think that may be the person' did not constitute a positive identification." Ellis, 739 N.E.2d at 1116 n.7.

[11] "In September 1994, [Ellis] moved to suppress Sanchez's photographic identification. The suppression judge denied the motion." Ellis, 739 N.E.2d at 1116 n.8.

16

> Sanchez's earlier descriptions of her alleged stalker differed dramatically from the picture of Glover contained in the photographic array. Specifically, [Ellis] sought to present evidence contained in contemporaneous police reports (dated April and July, 1992, respectively), in which Sanchez described the stalker as being approximately six feet tall and slim, with a scar on his right hand. An affidavit from defense counsel indicated that Glover was five feet four inches, heavy set, and had no scar on either hand. This offer of proof was renewed prior to the third trial. At the third trial, both photographic arrays were admitted in evidence and Sanchez's identifications were the subject of extensive cross-examination. [Ellis] discredited Sanchez's testimony by eliciting the following: Sanchez was not "paying much attention" when she left the Walgreens, Detective Acerra was "a good friend" of Sanchez's mother, and that Sanchez "point[ed] out a different person that was stalking her" at the suppression hearing. Defense counsel invited the jury to compare [Ellis's] photograph with the one that Sanchez initially had selected ("the wrong guy"). Over his objection, [Ellis] was not permitted to inquire further about the stalker or any related description of his appearance.

Ellis, 739 N.E.2d at 1116-17 (citations omitted).

The SJC found that the trial judge did not abuse his discretion to set the scope of the extent of the impeachment of Sanchez's credibility because permitting the jury to compare Glover's actual appearance with Sanchez's description had limited probative value in light of the fact that when she examined the photographic array, Sanchez was asked to make an identification from a photograph depicting Ellis's head and facial features from among photographs of other black male faces, and because allowing the jury to contrast Sanchez's recollection of her stalker's height and non-facial scars (characteristics not observable in any of the photographs in the array) would not help the jury in their task. Id. at 1117.

Concerning the trial judge's decision regarding Sanchez's prior descriptions of the stalker, the SJC also found unpersuasive Ellis's argument that Sanchez's original descriptions of her stalker were admissible to show that any explanations for Sanchez's failure to select Ellis were after-the-fact attempts to bolster the credibility of the Commonwealth's sole eyewitness. Id. The SJC first noted that Sanchez was subject to rigorous cross-examination, establishing that she had

17

identified two different photographs as her stalker (one at the police station, another at the suppression hearing). Id. It also concluded that Ellis had ample opportunity to impeach Sanchez, noting that during closing arguments, Ellis focused the jury's attention upon Sanchez's credibility by suggesting that her "prior inconsistent statements are evidence . . . of lack of believability" and reminding them of the "bizarre thing about the stalker" and by asking the jury, "Is this a person that you are going to rely on in the most serious case that the Commonwealth can have? . . . Would you rely on this teenager?" Id.

Additionally, the SJC found that even if the jury had refuted the Commonwealth's first explanation for Sanchez's misidentification (i.e., that it was attributable to her agitated state after having seen a photograph of her stalker), the Commonwealth nevertheless presented ample evidence supporting its additional explanation (i.e., Sanchez's fear of becoming involved in a murder investigation) and a reasonable jury could have believed that explanation. Id. at 1118. Thus, it concluded that, because the jury could reasonably infer that fear of retaliation was the reason for Sanchez's misidentification, any error on the part of the trial judge in refusing to admit Ellis's proffered evidence was harmless beyond a reasonable doubt. Id. (citing Commonwealth v. Peixoto, 722 N.E.2d 470, 472 (Mass. 2000)).

Finally, the SJC found that, in any event, Ellis was provided with reasonable latitude to challenge Sanchez's ability to perceive and remember, even without the opportunity to cross examine her concerning the conditions under which she saw and described her stalker, and that the trial judge acted within his discretion in limiting the impeachment of Sanchez. Id.

To prevail on this claim, Ellis must establish that the SJC's decision permitting these limitations on the cross-examination of Sanchez "was contrary to, or involved an unreasonable

18

application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). Pursuant to the Confrontation Clause of the Sixth Amendment, a criminal defendant has the right "to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. "The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings . . . means more than being allowed to confront the witness physically. . . . Indeed, the main and essential purpose of confrontation is <u>to secure for the opponent the opportunity of cross-examination</u>." Van Arsdall, 475 U.S. at 678 (internal quotations and alterations omitted). However, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Abram v. Gerry, 672 F.3d 45, 52 (1st Cir. 2012) (quoting Delaware v. Fensterer, 474 U.S. 15, 20 (1985)). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679.

In preventing the jury from comparing Glover's actual appearance with Sanchez's description, the trial court exercised its "wide latitude under the Sixth Amendment to limit repetitive or marginally relevant cross-examination." United States v. Perez-Montanez, 202 F.3d 434, 440 (1st Cir. 2000). The trial court permitted, as required, wide ranging impeachment concerning the identification of Glover. It drew the line at examination of the collateral question of the accuracy of her identification of her stalker measured against her earlier description of the stalker. This limitation was not contrary to or an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States.

III.     CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court DENY the Petitioner's Petition for Writ of Habeas Corpus.[12]

                                    SO ORDERED.


                                         /s / Leo T. Sorokin
                                    UNITED STATES MAGISTRATE JUDGE

---

[12] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).